UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
JACQUES DORCELY,

                         Plaintiff,                     **MEMORANDUM & ORDER**

      -against-                                    06 CV 1265  (DRH) (AKT)

WYANDANCH UNION FREE SCHOOL
DISTRICT, BOARD OF EDUCATION WYANDANCH
UNION FREE SCHOOL DISTRICT, DR. SHERMAN
ROBERTS, in his capacity as Interim Superintendent of
Schools, WYANDANCH UNION FREE SCHOOL
DISTRICT, and Individually, DR. FRANK SATCHEL, in
his capacity as Superintendent of Schools and Individually,
SAMUEL BURNETT, as Trustee and Individually, JAMES
CRAWFORD, as Trustee and Individually, REV. HENRY
BACON, as Trustee and Individually, DENISE BAINES,
as Trustee and Individually, SHIRLEY BAKER, as Trustee
and Individually, SISTER SAKINAH KAREEEM, as Trustee
and Individually, BARRY WHITE, as Trustee and Individually,
REV. MICHAEL TALBERT, as Trustee and Individually,
NORINA GETER, as Assistant Superintendent for Human
Resources, WYANDANCH UNION FREE SCHOOL
DISTRICT, and Individually, DARLENE WHITE, as Principal
for Dr. Martin Luther King, Jr. Elementary School,
WYANDANCH UNION FREE SCHOOL DISTRICT and
individually, GINA TALBERT, as Principal for Milton L.
Olive Middle School, WYANDANCH UNION FREE SCHOOL
DISTRICT, and Individually, LARRY J. McCORD, as attorney
for the WYANDANCH UNION FREE SCHOOL DISTRICT,
and Individually,

                             Defendants.
-----------------------------------------------------------X

**APPEARANCES:**

**HARRIET A. GILLIAM, ESQ.**
Attorney for Plaintiff
P.O. Box 1485
Riverhead, New York 11901

**AHMUTY, DEMERS & McMANUS, ESQS.**
Attorneys for District Defendants
200 I.U. Willets Road
Albertson, New York 11507
By: Greg Curry, Esq.

Robert J. Hindman, Esq.

**CASTRO & TRODDEN, LLC**
Attorneys for Defendant Larry J. McCord
29 Bellemeade Avenue, Suite A201
Smithtown, New York 11787
By: Brian A. Trodden, Esq.

**HURLEY, Senior District Judge:**

Plaintiff Jacques Dorcely filed the present action against defendants Wyandanch Union Free School District, Board of Education Wyandanch Union Free School District (the "Board of Education"), Dr. Sherman Roberts, in his capacity as Interim Superintendent of Schools, Wyandanch Union Free School District and Individually, Dr. Frank Satchel, in his capacity as Superintendent of Schools and Individually, Samuel Burnett, as Trustee and Individually, James Crawford, as Trustee and Individually, Rev. Henry Bacon, as Trustee and Individually, Denise Baines, as Trustee and Individually, Shirley Baker, as Trustee and Individually, Sister Sakinah Kareem, as Trustee and Individually, Barry White, as Trustee and Individually, Rev. Michael Talbert, as Trustee and Individually, Norina Geter, as Assistant Superintendent for Human Resources, Wyandanch Union Free School District, and Individually, Darlene White, as Principal for Dr. Martin Luther King, Jr. Elementary School and Individually, Gina Talbert, as Principal for Milton L. Olive Middle School, Wyandanch Union Free School District and Individually, (collectively the "District Defendants"), and Larry J. McCord, as attorney for the Wyandanch Union Free School District and Individually ("Defendant McCord"), alleging violations of the equal protection and due process clauses pursuant to 42 U.S.C. § 1983 ("Section 1983"); violations of the First Amendment pursuant to Section 1983; and violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"),

Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(d) ("Title VI"), and the New York State Human Rights Law, N.Y. Exec. Law § 296 on the basis of his national origin and gender, and in retaliation for engaging in protected activity. The District Defendants and Defendant McCord (hereinafter "Defendants") have moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons that follow, Defendants' motion is granted.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local 56.1 Statements, are either undisputed or are taken in the light most favorable to Plaintiff, unless otherwise noted.

The Wyandanch Union Free School District (the "District") is located in Suffolk County and administers, *inter alia*, the Milton L. Olive Middle School (the "Middle School") and the Dr. Martin Luther King, Jr. Elementary School (the "Elementary School"). Jacques Dorcely ("Plaintiff" or "Dorcely") is a male of Haitian national origin and holds Master's Degrees in education and in school psychology from Adelphi University. He was employed by the District as a full-time, probationary school psychologist from September 2, 2003 until September 18, 2004, the date of his termination.

### A.    *Plaintiff's Employment in the Middle School*

Defendant Gina Talbert ("Talbert"), principal of the Middle School, interviewed Dorcely for the position of school psychologist, and in a memorandum dated August 19, 2003, recommended Plaintiff for that position to defendant Norina Geter ("Geter"), Assistant

Superintendent for Human Resources for the District.[1]  At a Board of Education meeting on

September 2, 2003, Plaintiff was appointed to the position of school psychologist in the Middle

School, effective September 2, 2003.  Dorcely's appointment had a three year probationary

period.

On September 18, 2003, Talbert assigned Dorcely to act as a scribe to provide

testing modifications for a special education student in a sixth grade classroom.  During that

class, a female student had an emotional outburst and the classroom teacher, Ms. Popco, went to

Talbert's office to discuss the incident.  Plaintiff was accused of unprofessionalism by Talbert

for his response to the incident.  Contrary to Talbert's accusations, Plaintiff maintained that his

response to that situation was appropriate.

The following day, Talbert spoke with Plaintiff about a student who needed

dyslexia testing and advised Dorcely to consult with Ms. Romagnano regarding a concern she

had with the student.  According to Plaintiff, Talbert had interrupted Dorcely's testing of a

different student and had raised her voice at him.  Plaintiff asked Talbert if they could discuss the

matter privately, and Talbert used Mrs. Batchelor's office to continue their discussion.  During

the meeting, Talbert telephoned Vonnye Singleton ("Singleton"), the director of special

education, and scheduled a meeting for the three of them for the following Monday.  Following

the telephone call, the meeting between Plaintiff and Talbert continued to digress.  Dorcely

raised issues with Talbert about the ineffective intervention measures that were in place in the

building.  Talbert allegedly told Dorcely that he did not know his job, that he did not fit into the

_____

[1]As Assistant Superintendent for Human Resources, Geter was the custodian of personnel
files for the District's employees.

culture of the school, that she did not want to see his face in the building and that he was being insubordinate.

Talbert immediately telephoned the interim superintendent, defendant Sherman Roberts ("Roberts"), informed him of the September 18th and September 19th incidents, memorialized the two events in writing, and recommended that Plaintiff be terminated. The following day, in a letter dated September 19, 2003 that was hand delivered to Plaintiff, Roberts advised him that, effective immediately, he was reassigned to administrative leave at home which would remain in effect until further instruction. In addition, the letter directed that Dorcely was not permitted to be on any school property of the District and was prohibited from making contact with the administration or staff from the Middle School or the District in general. Further, the letter advised Plaintiff not to contact him, but to await his contact as to the date and time that he would meet with all parties concerned with the matter. Roberts made arrangements to send Dorcely's personal belongings to his home by courier.

While he was on administrative leave at home, Dorcely was replaced by an African-American female school psychologist.

In a certified letter dated September 24, 2003, Geter informed Plaintiff that a recommendation for his termination would be presented to the Superintendent and the Board of Education, to be effective October 30, 2003, and that his reassignment to administrative leave at home would be continued. Plaintiff responded by requesting a statement of reasons for the proposed termination and a hearing before the Board of Education. Talbert prepared a memorandum outlining the reasons for her recommendation of Plaintiff's termination.

By letter dated October 9, 2003, Roberts set forth the reasons for Dorcely's termination, which included Plaintiff's failure to follow appropriate directions from the building principal; his failure to involve himself professionally in a classroom incident that he had witnessed; Plaintiff's intimidating, threatening, and inappropriate conduct towards school personnel; and Plaintiff's failure to maintain effective, professional communication with the building principal. Dorcely denied the allegations and responded that the statement of reasons were totally subjective, vague, and amounted to malicious actions by Talbert to have him removed from the Middle School. On December 9, 2003, Plaintiff was afforded a hearing before the Board of Education and testified on his own behalf.

At a Board of Education meeting held on January 21, 2004, the Board voted not to terminate Plaintiff's employment with the District. Roberts confirmed the vote to Plaintiff in a letter dated January 29, 2004, and notified Dorcely that he was reassigned to the Elementary School as a school psychologist, effective February 2, 2004 and would be under the direct supervision of the building principal defendant Darlene White ("White").

**B.      *Plaintiff's Employment in the Elementary School***

At the end of January 2004, Geter advised White that Plaintiff would be coming to the Elementary School as a school psychologist to help Dr. Ifalase ("Ifalase") with his cases. White had not known Dorcely prior to his reassignment and was unaware that he had been the subject of a disciplinary action.[2] White and Singleton had a discussion about Plaintiff's assignment to assist Ifalase with his caseload at the Elementary School.

---

[2]At the time of the transfer, Roberts directed that there be no communication between Talbert and White about what had occurred in the Middle School.

Dorcely was assigned an office in the "decontamination room" in the nurse's office. He made requests for supplies and resource materials and when he was not satisfied with White's responses, he tried to obtain equipment and other materials by asking other District employees for help. White spoke to one of the Board members about procuring a computer for Plaintiff, and the Board member told her that Dorcely had already made such a request and that he would give Plaintiff one of the computers that had been donated to the District.

On March 19, 2004, White's secretary asked Plaintiff to cover a class for Ms. Roth.[3] Because he was testing a student, Plaintiff completed administering the test and then proceeded to the office to inquire about the assignment. It took Plaintiff approximately thirty minutes to meet with White, make copies of instructional materials for the students, and report to the classroom. Until Dorcely arrived to Ms. Roth's classroom, it was covered by Mr. Valentine. White issued a written reprimand dated March 26, 2004 accusing Plaintiff of failing to cooperate to cover another teacher's class which was placed in his personnel file and to which he responded with a written rebuttal dated March 29, 2004.

On March 31, 2004, White directed Plaintiff to document his daily activities in fifteen minute intervals.

On April 29, 2004, an emergency evacuation drill was conducted at the Elementary School. In preparation for the drill, White had held a meeting on the prior day with all of the staff to go over the procedure. Dorcely was absent from school on the day of the meeting. During the emergency evacuation drill, all of the students and staff, except Plaintiff,

---

[3]White asked all personnel who did not have an assigned class to cover a class due to the inclement weather that day.

evacuated the building. Dorcely was in his office with the door closed and stated that he did not hear the drill. In a letter dated April 29, 2004, White issued a written reprimand accusing Plaintiff of failing to adhere to the policy she had gone over with staff the previous day regarding the evacuation drill. White stated in her letter that when she realized that everyone was accounted for except Plaintiff, she had sent Mr. Berger into the building to look for Dorcely and to ask him to evacuate the building. She reported that Plaintiff refused to evacuate and told Mr. Berger that he had thought it was just a drill. In her letter, White explained that the school and the District could have been issued a citation because she gave the "all clear" signal that the building was evacuated when it was not. Plaintiff issued a written rebuttal reminding White that he was absent the previous day and therefore was not present at the staff meeting or aware of any drill.

At some point, Dorcely raised concerns to White about the lack of educational resources for the students and certain teachers' treatment of students. By letter dated April 29, 2004, White stated that she had already addressed his complaints that certain teachers did not have appropriate materials to teach their students with the teachers in question, and she was assured by those teachers that they had adequate materials to provide quality instruction for their students. Additionally, White reported that she had received complaints from staff members that Dorcely was questioning teachers about students that were not part of his caseload. Finally, White reprimanded Dorcely for telling her that he expected her to address his complaints and for interrupting her when she was with co-workers or parents and directed him to refrain from that type of behavior. White stated that in the future she expected Plaintiff to give her the proper respect and adhere to the procedures she had established.

After receiving the two April 29th letters, Plaintiff went to White's office. Although White was in a meeting with one of her secretaries, Dorcely walked into her office and handed White a memo. Plaintiff maintains that he never met with White concerning her April 29, 2004 reprimands. White, however, asserts that she memorialized this incident in a letter to Plaintiff dated April 30, 2004, stating that Dorcely had insisted that she meet with him, that she had agreed to speak with him after her meeting with her secretary, that during the meeting Plaintiff had raised his voice and yelled at her, and that she would not tolerate this behavior and deemed his acts to be blatant insubordination. In her letter, White instructed Plaintiff to adhere to the Elementary School policies. White also memorialized this incident in an April 30, 2004 memorandum to Roberts and reported that Plaintiff had inquired of her why she was writing him up every chance she could.[4]

A few days later, in a May 3, 2004 memo to Roberts, White recommended that Dorcely be dismissed. In her memo, she made the following representations:

- the Plaintiff kept making a number of unreasonable requests and insisted that White honor them, such as a flat-screen computer when no one in the elementary school had one;

- the Plaintiff wanted a new desk when there were no desks available, and the desk he had belonged to a prior psychologist – and he even asked for the desk in the main office;

- the Plaintiff had difficulty implementing any tasks that White assigned to him;

_____

[4]Dorcely was not copied on White's April 30, 2004 memo to Roberts, even though the memo was placed in his personnel file. Plaintiff was not able to submit a rebuttal to this memo because he did not see it until August 17, 2004, the day before his termination hearing, when he was granted access to his personnel file.

- the Plaintiff did not adhere to school procedures and policies that White put in place, such as that all staff members were to see one of White's secretaries to schedule appointments and meetings with her; instead he would walk past the secretaries and into White's office, insisting that she meet with him;

- White had been in meetings when the Plaintiff would interrupt her to say he needed her; and after White would tell him she was in a meeting, the Plaintiff would lurk around the door and constantly peek in;

- the Plaintiff would tell White how to do her job in an inappropriate manner; he also did this with some of the teaching staff;

- if White denied one of Plaintiff's requests he immediately called Singleton to undermine White's authority, when White was ultimately responsible for the day-to-day operations of the elementary school;

- because Plaintiff was not able to take directions from White, in her professional opinion the Plaintiff should be terminated;

- the Plaintiff did not possess the qualities White looked for in a psychologist;

- the Plaintiff was not a "team player" and had shown difficulty communicating with teachers;

- the Plaintiff displayed more concern over material things than the needs of the students;

- the students in the District had numerous challenges, and they needed supportive and reliable individuals helping them, and must feel comfortable in trusting the psychologist; however White did not feel comfortable working with the Plaintiff and in having the Plaintiff work with her students;

- as a result of their April 29, 2004 confrontation, White, as an adult, felt "scared" by the Plaintiff;

- White said "she could only imagine how one of her precious little children would feel if this incident had occurred with one of them as opposed to her";

- the District should be proactive and prevent any future harm from occurring by terminating Plaintiff;

- the long-term effects of the Plaintiff's behavior and actions on children could be detrimental and could cause "severe damage" to the children that he was hired to help.

On May 3, 2004, Plaintiff also sent a memo to Roberts regarding his complaints of harassment by White, including that he was being harassed by having to document his time in fifteen minute intervals; that he was being undermined by other teachers monitoring him at the direction of White; that he was being punished for having complained about the fact that children in the building could not read, that they did not have adequate instructional materials and resources to help them, and that some students were being subjected to inappropriate disciplinary actions; and that White has commenced a practice and pattern of issuing written and verbal reprimands on almost a daily basis which were replete with mischaracterizations of his conduct.

White prepared end-of-the-year performance evaluation for Plaintiff, which was signed by both White and Dorcely on June 7, 2004. Because Plaintiff requested that White not evaluate him when he was formally interacting with students due to confidentiality concerns, White based her evaluation on his informal work with students, what he did with his time, her correspondence with him, her conversations with him, and her overall assessment of his job performance in the Elementary School. White noted in Plaintiff's performance evaluation that

he "meets criteria" in such areas as effective planning skills; uses appropriate techniques to motivate the students; communicates effectively with students; provides students with specific evaluative feedback; displays a thorough knowledge of the subject matter; provides opportunities for individual differences; ensures students' time on tasks; sets high expectations for student achievement; demonstrates evidence of personal organization; demonstrates effective interpersonal relationships with others; demonstrates awareness of the needs of students; provides positive self-concept; and promotes self-discipline and responsibility. White also noted that Plaintiff "needed improvement" in such areas as planning for and making effective use of time, materials and resources; in setting high standards for student behavior; demonstrating sensitivity in relating to students; demonstrating employee responsibility; supporting school regulations and policies; and in assuming responsibilities outside the classroom as they relate to school. Plaintiff submitted a rebuttal to the performance evaluation and addressed each of the areas in which he was assessed by White as "needed improvement."

In a letter dated June 15, 2004, Geter advised Plaintiff that a recommendation for his termination would be presented to the Superintendent and then to the Board of Education. On June 21, 2004, Dorcely telephoned Geter to request an opportunity to review and copy material in his personnel file. Plaintiff followed up this request in a June 22, 2004 memo to Geter, and also requested that Geter send all copies of correspondence to his attorney, whom he had hired to represent him in connection with the proposed termination. By letter dated June 25, 2004, Geter informed Plaintiff that the District was in receipt of his June 22, 2004 request, but that because he retained counsel, he needed to have his attorney make such requests to the District's counsel.

When he received no response from his request, counsel for Plaintiff intervened by contacting McCord, the attorney for the District, to request that arrangements be made for Dorcely to review his personnel file. In addition, Plaintiff requested from Roberts a statement of reasons for the recommendation for his termination and further requested a hearing before the Board of Education. Plaintiff's counsel also contacted McCord requesting the statement of reasons for the termination. According to Plaintiff, McCord responded that Plaintiff need not be provided a statement of reasons or access to his personnel file because the issue involved Plaintiff's inability to get along with his boss and that issue could form the basis for the termination.

On July 7, 2004, defendant Dr. Frank Satchel ("Satchel") replaced Roberts as Superintendent of Schools for the District.

In a July 27, 2004 letter, Plaintiff's counsel requested a statement of reasons for the recommendation of termination. In a letter dated July 28, 2004, which Plaintiff received on August 5, 2004, Satchel set forth a statement of reasons, including that there was:

> [a] continued lack of due diligence in the performance of his job-related duties as exemplified by the following:
>
> a)    Plaintiff's failure to follow up appropriate direction from the building principal;
>
> b)    Plaintiff's failure to maintain appropriate discipline in a professional manner in a classroom incident;
>
> c)    Plaintiff's inappropriate and unprofessional conduct toward school personnel and the building principal;
>
> d)    Plaintiff's failure to maintain appropriate, effective and professional communications with the building principal;

e)  Plaintiff' failure to maintain appropriate, professional and required records in a timely manner, as directed by the building principal;

f)  Plaintiff's failure to plan for and make effective use of time;

g)  Plaintiff's failure to set high standards for student behavior;

h)  Plaintiff's failure to demonstrate sensitivity in relating to students.

Plaintiff and his counsel renewed their requests to review his personnel file.

Geter contacted Plaintiff on August 16, 2004 to inform him that he could review his file the following day.  Upon review, Plaintiff discovered, *inter alia*, (i) a notation to White to come up with reasons for his termination, (ii) a May 3, 2004 memo from White to Roberts calling for his termination that Plaintiff was not copied on, (iii) the absence of certain rebuttals he had made to White's reprimands, and (iv) documents in his personnel file that should not have been there, to wit, McCord's billing statements in connection with Plaintiff and McCord's notes in his file regarding the investigation of charges against him.

In mid-August 2004, Satchel contacted White to inquire about Plaintiff's job performance.  This was the first time White became aware that Dorcely was being considered for termination.  In response to Satchel's call, White sent him a copy of her May 3, 2004 letter to Roberts.

On August 18, 2005, the Board of Education afforded Plaintiff a hearing. Following the hearing, all of the Board members voted to terminate Plaintiff's employment.

## C.   *Plaintiff's Complaint*

On March 20, 2006, Plaintiff commenced the instant action. Plaintiff's Complaint asserts fourteen remaining[5] causes of action: (1) violation of equal protection pursuant to Section 1983 as to Defendant Gina Talbert; (2) violation of the First Amendment pursuant to Section 1983 as to Defendant Gina Talbert; (3) violation of the First Amendment pursuant to Section 1983 as to Defendant Roberts; (4) discrimination on the basis of national origin and in retaliation for having engaged in protected activity in violation of Section 1983 as to Defendant Roberts; (5) violation of equal protection pursuant to Section 1983 as to Defendant Darlene White; (6) violation of the First Amendment pursuant to Section 1983 as to Defendant Darlene White; (7) violation of due process pursuant to Section 1983 as to Defendant Geter; (8) violation of due process pursuant to Section 1983 as to Defendant McCord; (9) violation of equal protection pursuant to Section 1983 as to Defendant Satchel; (10) discrimination on the basis of national origin and in retaliation for having engaged in protected activity in violation of Title VII as against Defendant Board of Education; (11) violation of equal protection pursuant to Section 1983 as to Defendant Board of Education; (12) discrimination on the basis of national origin in violation of Title VI as against Defendant District, Defendant Gina Talbert, Defendant Sherman Roberts, Defendant Darlene White, Defendant Frank Satchel, and Defendant Michael Talbert; (13) retaliation for engaging in protected speech in violation of the First Amendment as against Defendant Board of Education; and (14) violation of equal protection, due process and freedom of expression pursuant to Title VI and Section 1983 as against Defendant Burnett, Defendant

---

[5]By Memorandum and Order dated September 25, 2007, this Court granted Defendants Wyandanch Teachers' Association and Peter Noto's motion to dismiss the Fifteenth and Sixteenth Causes of Action pursuant to Fed. R. Civ. P. 12(b)(6). (Memorandum and Order, dated September 25, 2007.)

Crawford, Defendant Bacon, Defendant Baines, Defendant Baker, Defendant Kareem and Defendant Barry White.

Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## DISCUSSION

### I.      *Applicable Law and Legal Standards*

#### A.      *Summary Judgment*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law. *See Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir. 2008); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009); *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See SCR Joint Venture*, 559 F.3d at 137; *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show "'that the affiant is competent to testify to the matters stated therein'." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

The district court, in considering a summary judgment motion, must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary

burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

Summary judgment is generally inappropriate where questions of the defendant's state of mind are at issue, *Gelb v. Board of Elections of the City of New York*, 224 F.3d 149, 157 (2d. Cir. 2000), and should thus be granted with caution in employment discrimination cases. *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *see Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000). Nonetheless, "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994). "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to

commercial or other areas of litigation." *Id.* "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo*, 22 F.3d at 1224.

### B. *McDonnell-Douglas Burden-Shifting Framework*

In an employment discrimination case such as this, where there is no direct evidence of discriminatory conduct, Plaintiff's discrimination claims brought under Section 1983, Title VII, Title VI and the New York State Executive Law are analyzed under the now familiar burden-shifting analysis set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (Section 1983 claims), *overruled on other grounds*, *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006); *Ragusa v. Malverne Union Free Sch. Dist.*, 582 F. Supp. 2d 326, 339 (E.D.N.Y. 2008) (Title VII and Section 1983 claims); *Solomon v. Uniondale Union Free Sch. Dist.,* No. 03-CV-2415 (SJF) (ETB), 2007 WL 608137, at *3 (E.D.N.Y. Feb. 16, 2007) (Title VII, Title VI, Section 1983 and New York Executive Law). Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of "discrimination vel non;" and, thus, (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that race discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier

of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

A plaintiff sets forth a "prima facie case of discrimination by showing that: 1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (internal quotation marks and citations omitted) (Title VII claims); *see Augustin v. Enlarged City Sch. Dist. of Newburgh*, 616 F. Supp. 2d 422, 439 (S.D.N.Y. 2009) (Section 1983 claims). The burden of establishing a prima facie case of employment discrimination has been described as "modest," *Viola*, 42 F.3d at 716, or even "minimal." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). It is a burden of production, not persuasion, and involves no credibility assessments. *Reeves*, 530 U.S. at 143.

Likewise, the employer's burden of showing a legitimate nondiscriminatory reason for its actions is not a particularly steep hurdle. It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are nondiscriminatory. *See Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 111 (W.D.N.Y. 2002) (citing, *inter alia*, *Meiri*, 759 F.2d at 995 (2d Cir. 1985)), *aff'd*, 99 Fed. Appx. 350 (2d Cir. 2004). Federal courts do not have a "roving commission to review business judgments," *Mont. v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (internal quotation marks and citation omitted), and "may not sit as super personnel departments, assessing the merits — or even the rationality — of employers' nondiscriminatory business decisions." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991). Thus, "[e]vidence that an employer made a poor business

judgment . . . generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

In order to demonstrate that the employer's stated nondiscriminatory reasons for the allegedly discriminatory action are pretextual, "[a] plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995). A discrimination claimant "may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." *Bombero v. Warner-Lambert Co.,* 142 F. Supp. 2d 196, 203 n.7 (D. Conn. 2000) (internal quotation marks and citations omitted), *aff'd* 9 Fed. Appx. 38 (2d Cir. 2001). .

However, to rebut an employer's proffered nondiscriminatory rationale for its actions and withstand summary judgment, a plaintiff must present more than allegations that are "conclusory and unsupported by evidence of any weight." *Smith v. Am. Exp. Co.*, 853 F.2d 151, 154-55 (2d Cir. 1988). "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases." *Meiri*, 759 F.2d at 998.

As a preliminary matter, Defendants do not dispute that Plaintiff, who is Haitian, belongs to a protected class. Nor do the parties dispute that Plaintiff was qualified for his position. Defendants do, however, dispute whether certain conduct could be considered

"adverse employment actions," and whether the "adverse employment actions" gave rise to an inference of discrimination based on national origin and/or gender. The Court will address each of Plaintiff's claims of discrimination as they relate to the respective Defendants in the relevant discussion section below.

## II.      Section 1983 Claims

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. That is, Section 1983 "furnishes a cause of action for the violation of federal rights created by the Constitution." *Brierly v. Deer Park Union Free Sch. Dist.*, 359 F. Supp. 2d 275, 290 (E.D.N.Y. 2005) (internal quotation marks and citation omitted). To prevail on a Section 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. *See* 42 U.S.C. § 1983; *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004). In addition, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Back*, 365 F.3d at 122 (internal quotation marks and citation omitted).

Plaintiff asserts violations of his rights to equal protection of the law, free speech, and due process of law, which the Court will address in turn.

**A.**     *Equal Protection Claim*s

The Equal Protection Clause of the Fourteenth Amendment guarantees "'[ the] right to be free from invidious discrimination in statutory classifications and other governmental activity'." *Bernheim,* 79 F.3d at 323 (quoting *Harris v. McRae*, 448 U.S. 297, 322 (1980)). "The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). Thus, "[a]n equal protection claim has two essential elements: (1) the plaintiff was treated differently than others similarly situated, and (2) this differential treatment was motivated by an intent to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Lovell v. Comsewogue Sch. Dist.*, 214 F. Supp. 2d 319, 321-22 (E.D.N.Y. 2002) (citing *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)); *see Humphrey v. County of Nassau*, No. 06-CV-3682 (JFB) (AKT), 2009 WL 875534, at *17 (E.D.N.Y. Mar. 30, 2009) ("To state a claim of discrimination under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against [him] on the basis of [his] membership in a protected class.").

"Whether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir. 2000). "To be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare [himself] must be similarly situated in all material respects." *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992)). In order to satisfy *Shumway's* "all material respects" standard, a plaintiff must show "co-employees were

subject to the same performance evaluation and discipline standards." *Graham*, 230 F.3d at 40

(citing *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 96 (2d Cir. 1999)).  In addition, a

plaintiff must demonstrate that the similarly situated employees engaged in comparable conduct.

*Id.*

### 1.      *Equal Protection Claim Against Defendant Gina Talbert*

As a threshold matter for purposes of individual liability under Section 1983, it is

clear that Gina Talbert was "personally involved" in the purported deprivation and acted under

color of state law, when as Principal of the Middle School, she recommended that Dorcely be

terminated from his position as school psychologist.  The question, then, is whether there is

sufficient evidence for a jury to find that Talbert acted to deprive Plaintiff of his right to be free

from discrimination based on his Haitian national origin and/or his gender.  Applying the

*McDonnell-Douglas* framework as set forth below, the Court answers this question in the

negative and holds that Dorcely has failed to produce sufficient evidence to defeat summary

judgment as to Talbert on his equal protection claim.

#### (a)      *Prima Facie Case*

Plaintiff maintains that based on his national origin (Haitian) and gender (male),

Gina Talbert treated him differently than other similarly situated employees in the Middle

School by mounting false accusations against him concerning his behavior; subjecting him to

heightened scrutiny with regard to his work performance; stating in an incident report that he did

not "fit in with the culture" of the building; stating that she did not want to see his face in the

building; and ultimately recommending his termination.  Plaintiff's claim is based on the two

incidents that occurred on September 18, 2003 (when Talbert accused Dorcely of inappropriately

handling an emotional outburst of a student in a special education classroom) and September 19, 2003 (when Talbert accused Dorcely of threatening her during a meeting in the guidance office). As a result of Talbert's actions, Dorcely asserts that the interim superintendent placed Plaintiff on administrative leave at home, and directed him to stay away from the District and to refrain from contacting anyone in the District or he would be subject to arrest.

Defendant Talbert disputes that she discriminated against Plaintiff or treated him differently than the other Middle School employees, and disagrees with Dorcely's account of the September 18, 2003 and September 19, 2003 incidents. With respect to the September 18, 2003 incident, Talbert proffered evidence that the special education teacher reported that when her student had the emotional outburst, other teachers intervened to prevent the student from hurting herself, but Plaintiff turned his back to the class and looked out the window. Plaintiff stated in his deposition testimony that he did not ignore the situation but rather pursuant to his professional judgment, he had removed all objects from the student's reach and cleared the area to insure the safety of her classmates.

With respect to the September 19, 2003 incident, in her deposition testimony, Talbert stated that when she tried to discuss the needs of a dyslexic student, Plaintiff kept interrupting her, elevated his voice, and refused to listen. She reported that she then walked to the door to leave the room but that when she turned to speak to Plaintiff, he was "physically in her personal space." Talbert asked Dorcely to back up, and when he did not move, she felt "threatened and intimidated." Later that same day, Talbert asserts that as she was leaving the building, Plaintiff brushed against her arm. Talbert testified that she then recommended to the acting superintendent that Plaintiff be immediately terminated based on his display of

unpredictable, intimidating, insubordinate, and threatening behaviors which she perceived "exemplified great potential of unsafe and harmful actions." (*Curry Aff.*, dated Aug. 22, 2008, Ex. E.) Plaintiff maintains that Talbert's account of the incident is factually inaccurate and mischaracterizes his actions.

Although the parties dispute the facts relevant to the two aforementioned incidents, there is no dispute that Plaintiff has met the first three requirements of his prima facie case, namely that Plaintiff was in a protected class, was qualified for the position, and suffered an adverse employment action when Talbert made her recommendation that Plaintiff be discharged, and Plaintiff was placed on administrative home leave. Defendant argues, however, that Dorcely has failed to establish that the circumstances surrounding Talbert's recommendation for his termination gave rise to an inference of discrimination based on his Haitian national origin or his gender. Despite Defendant's argument to the contrary, the Court concludes that Plaintiff has established a prima facie case of discrimination. The Plaintiff's burden for establishing a prima facie case is minimal. The fact that Dorcely, a Haitian male, was replaced by an African-American woman when he was on administrative leave at home is sufficient to give rise to an inference of discriminatory intent. *See Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 283 (D. Conn. 2008).

### (b) *Legitimate, Nondiscriminatory Reason*

Defendant has advanced a legitimate, nondiscriminatory basis for her recommendation that the Plaintiff be immediately terminated, namely Plaintiff's lack of professionalism, negligence in meeting student needs, insubordination, failure to follow administrative procedures, inappropriate workplace behavior and threatening conduct toward

school personnel.  *See, e.g., Jones v. Yonkers Public Sch.*, 326 F. Supp. 2d 536, 543-44

(S.D.N.Y. 2004) (concluding that misconduct, poor performance, and violation of employer's

rules and procedures are legitimate, nondiscriminatory reasons for termination).  In her Incident

Report # 1, Talbert stated, *inter alia,* with respect to the September 18, 2003 event:

> Mr. Dorcely has not demonstrated receptiveness and compliance to
> administrative directives, which is a blatant act of insubordination.
> I deem this preferred lack of professional intervention and
> assistance in the classroom when the student was having a tantrum,
> as an act of negligence.  Of the four adults in the classroom, Mr.
> Dorcely was the most qualified and trained personnel and he
> refused to act in a professional manner when the 'emotionally
> disturbed' child exhibited behaviors that were an endangerment to
> herself and others.  It is further my recommendation, that Mr.
> Dorcely has not exemplified the professional expectations of a
> School Psychologist in a high needs school and district, such as
> ours.  Our students need personnel who demonstrate a caring,
> nurturing, and giving disposition when they need it most.  A school
> psychologist should always act in the best interest of the student
> and advocate for the welfare of the student at all times.  Mr.
> Dorcely has not demonstrated this expectation.  It is my
> recommendation that his services are terminated due to acts of
> insubordination to administration and negligence in adequately
> meeting the needs of students as outlined above.

(*Curry Aff.*, dated Aug. 22, 2008, Ex. D.)

In her Incident Report #2, Talbert stated, *inter alia,* with regard to the September

19, 2003 event:

> It is evident that Mr. Dorcely does not fit into the culture of this
> building or the vision and framework of the District.  He has
> displayed unpredictable, intimidating, insubordinate, and
> threatening behaviors that exemplify great potential of unsafe and
> harmful actions.  It is my sincere recommendation that Mr.
> Dorcely is immediately terminated and not allowed in the presence
> of Wyandanch children, parents and faculty.

(*Curry Aff.*, dated Aug. 22, 2008, Ex. E.)

Thus, Defendant has articulated "clear and specific" reasons for recommending that Dorcely be terminated, supported by evidence "'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action'." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) (emphasis omitted)).

### *(c)      Pretext*

Because Defendant has proffered legitimate, nondiscriminatory reasons for the action taken against Plaintiff, under the *McDonnell-Douglas* analysis, Dorcely must show that these reasons are a pretext for wrongful discrimination. That is to say, Plaintiff must now come forward with evidence that gives rise to a genuine issue of material fact that discrimination, based on his Haitian national origin and/or the fact that he was a male employee, was at least one of the motivating reasons for Talbert's recommendation to terminate Dorcely's employment. Plaintiff fails to meet this burden.

In an effort to establish pretext, Plaintiff points to Talbert's statements that (i) Dorcely did not "fit in with the culture" of the building, and (ii) that she did not want to see his face in the building concomitant with the fact that Dorcely was replaced by an African-American female. Plaintiff claims that Talbert's two statements were directed at Haitian nationals in the workplace, and specifically at him. There is no evidence, however, that these statements support such an inference or demonstrate Talbert's discriminatory state of mind.

Plaintiff's chief evidence on point is his own letter to Dr. Roberts and the Board of Education dated November 3, 2003, wherein he responds to Talbert's two Incident Reports and registers his concern "about the subjective nature of the accusations leveled against [him]."

(*Gilliam Decl.,* dated October 3, 2008, Ex. M.) In his rebuttal, Plaintiff recounted his version of facts surrounding the two events, acknowledged that he had become "somewhat flustered" and unable to "respond to Ms. Talbert'[s] inquiry," and reported that (i) "Ms. Talbert continued to raise her voice, now attacking my integrity as a school psychologist," (ii) "Ms. Talbert was verbally abusive, telling me she did not want me in her building since I did not know my job," and (iii) "[a]t some point, [he] did make an apology just to calm her down in those words: 'I am sorry if I did anything wrong.'" (*Id.*) Further, his letter concluded, "In closing, the accusations leveled against me are factually incorrect and replete with subjective statements which are best summed up by Ms. Talbert's own words that she feels I do not fit into 'the culture of the building'." (*Id.*)

Assuming the veracity of these statements, at best, the statements tend to support a picture of a principal who may have been controlling, unpleasant, and unfair, but not ethnically or sexually biased. Indeed, as gleaned from Plaintiff's own rebuttal submission to Defendant's Incident Reports, there is no indication that Dorcely interpreted Talbert's "fit into the culture comment" as being predicated on his ethnic origin or gender. Notably, in her affidavit and deposition testimony, Talbert explained that by the "culture" of the building she meant that the culture of the Middle School was one of professional and controlled behavior, of respecting authority, of caring for the students and of putting the students' interests first. The context of the sentence, the paragraph the statement came from, and the overall recitation set forth in her Incident Report as well as the recitation in Plaintiff's rebuttal to the report, fail to dispute Talbert's explanation for the alleged adverse action or establish pretext.

Moreover, Plaintiff has set forth no other indicia that Talbert (or any other employee at the Middle School) subjected him to any ethnic or gender related comments or criticisms.

Finally, the fact that Talbert made the decision to recommend Dorcely's termination barely four weeks from the time she interviewed and personally recommended that Plaintiff be hired "strongly suggest[s] that invidious discrimination was unlikely." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (holding "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring"). Although Plaintiff maintains that the same actor inference should not be applied here because only the Board of Education had the authority to hire or fire Dorcely, the same actor inference "may be applied even when the supervisor at issue . . . is not the only person with input into the hiring and firing decision. The inference 'is applicable so long as one management-level employee played a substantial role in both the hiring and firing of the plaintiff'." *Jones,* 326 F. Supp. 2d at 546 (quotation omitted). Here, the evidence indicates that as principal of the Middle School, Talbert played a substantial role in both the hiring (she interviewed Plaintiff and recommended him for the position) and the recommendation of firing (she recommended the Plaintiff's termination to the Superintendent and the Board of Education) of Dorcely.

In sum, considering the record as a whole, and construing all ambiguities in Plaintiff's favor, Plaintiff has failed to set forth sufficient evidence from which a reasonable jury could find that Talbert's proffered neutral explanation was pretextual and that animus to his

national origin or gender was a motivating factor in her recommendation for Dorcely's termination of employment at the Middle School. *See King v. Bratton,* No. 96 CV 1131 (RJD), 2004 WL 3090605, at *7 (E.D.N.Y. Aug. 25, 2004); *see also Johnson v. National Mar. Union Pension and Welfare Plans*, No. 95-4112, 1998 WL 32759, at *4 (S.D.N.Y. Jan. 29, 1998). Accordingly, the summary judgment motion as to Plaintiff's equal protection claim against Defendant Gina Talbert is granted.

### 2. Equal Protection Claim Against Defendant Darlene White

Plaintiff maintains that Defendant Darlene White treated him differently than other similarly situated school psychologists in the Elementary School in terms of work assignments, office accommodations and resources, training, observations and evaluations, and unjust disciplinary actions, as a result of (i) his having engaged in the protected activity of challenging the prior disciplinary action, (ii) on account of his national origin, and (iii) on account of his gender.[6]

### (a) Retaliation under the Equal Protection Clause

As an initial matter, to the extent that Dorcely argues that he may assert a Section 1983 claim for retaliation (as a result of having engaged in protected activity) in violation of the Equal Protection clause of the Fourteenth Amendment, he is incorrect. There is no recognized claim for retaliation under the Equal Protection Clause. *See Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996) ("Although claims of retaliation are commonly brought under the First Amendment . . . and may also be brought under Title VII, . . . we know of no court that has

---

[6]Although in the Complaint, Plaintiff does not assert that defendant White's differential and discriminatory treatment was based on his gender, he raises this basis in passing in his opposition papers. (*Compare* Compl. ¶¶ 111-113 *with* Pl.'s Memorandum in Opp. at 15.)

recognized a claim under the equal protection clause for retaliation following complaints of []

discrimination"); *see also Parker v. New York State Office of Mental Health*, No. 07-CV-28

(FB)(MLO), 2009 WL 2317840, at *3 (E.D.N.Y. July 29, 2009) (same). Accordingly, as a

matter of law, Plaintiff's equal protection claim for retaliation is insufficient to withstand the

motion for summary judgment.

### (b)     Equal Protection Based on National Origin and Gender

"Despite the elaborate process set up in *McDonnell-Douglas*, Second Circuit case

law makes clear that a court may simply assume that a plaintiff has established a prima facie case

and skip to the final step in the *McDonnell-Douglas* analysis, as long as the employer has

articulated a legitimate, nondiscriminatory reason for the adverse employment action." *Idrees v.*

*City of New York*, No. 04 Civ. 2197 (LAK)(GWG), 2009 WL 142107, at *9 (S.D.N.Y. Jan. 21,

2009) (citing cases); *see, e.g., Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 188 (2d Cir. 2006) ;

*accord Morris v. Ales Group USA, Inc.,* 2007 WL 1893729, at *7 (S.D.N.Y. June 29, 2007)

("Rather than apply the *McDonnell Douglas* test formalistically, the Court will assume that

[plaintiff] has made out a *prima facie* case of discrimination on this claim."); *Mathews v.*

*Huntington*, 499 F. Supp. 2d 258, 264 (E.D.N.Y. 2007). Here, the Court assumes that Dorcely

has established a prima facie case of discrimination.

Defendant White has demonstrated legitimate, nondiscriminatory reasons for her

recommendation that Plaintiff be terminated, specifically: (i) his difficulty implementing any

tasks she assigned him; (ii) his failure to adhere to school procedures and policies; (iii) his

inappropriate workplace behavior; (iv) his inability to follow her directions; (v) his difficulty

communicating with fellow teachers; (vi) his inappropriate and unprofessional conduct toward

school personnel; and (vii) his intimidating and threatening conduct.  *See, e.g., Jones*, 326 F. Supp. 2d at 543-44 (concluding that poor performance both in carrying out of duties and in relationships with supervisors and co-workers is a legitimate, nondiscriminatory reason for termination and observing that "[g]etting along with one's co-workers is an essential component of satisfactory job performance, especially in a setting like an elementary school"); *Ramos v. Marriott Int'l, Inc.*, 134 F. Supp. 2d 328, 343 (S.D.N.Y. 2001) (holding that the "failure of an employee to get along with co-workers rebuts the employee's prima facie case even if the employee's performance ratings were high in other respects").  In addition, White articulated that Dorcely's behavior constituted a threat to the safety and well being of the children in the Elementary School.  *See Brown v. Scarsdale Vill. Hall*, No. 95 CIV. 4488 DLC, 1996 WL 445360, at *5 (S.D.N.Y. Aug. 7, 1996) (concluding employer fired plaintiff for legitimate, nondiscriminatory reasons where plaintiff's "behavior constituted a threat to the safety of [the] employees and presented a serious management problem"), *aff'd* 113 F.3d 1229 (2d Cir. 1997).

Thus, Dorcely has the burden of marshaling evidence that would permit a reasonable juror to find that a motivating factor for White's recommendation for his termination was based on his membership in a protected class.  Dorcely has not presented sufficient evidence to create such an issue of fact.

Plaintiff points to the following evidence to support his allegation that White treated him less favorably than others similarly situated in the Elementary School based on his Haitian national origin and because he was a male: (i) he was the only Haitian national school psychologist in the Elementary School in a District that had a growing population of Haitian national students; (ii) every teacher received a school handbook except him; (iii) he reported

directly to White for his assignments and supervision, while the other school psychologists reported to Singleton for their caseloads and assignments; (iv) the other school psychologists had an assigned caseload of students, while he was never assigned a full and regular assignment of students, but rather was assigned to monitor lunch and cover classes for absent teachers; (v) the other school psychologists had an office and resource materials for their students, but he was placed in the decontamination room in the nurse's office and was not given resource materials or a computer; (vi) White demanded that Plaintiff document his daily time schedule in fifteen minute intervals, while not requiring the other psychologists to submit their time schedules to her on a regular basis; (vii) White did not meet with Plaintiff and provide him with a summary of her evaluations of his work performance as she did with other school employees; and (viii) White placed unwarranted disciplinary actions in his personnel file, including two documents placed in his file without his knowledge, to wit, a memorandum, dated May 3, 2003, that recommended his termination, and a letter, dated April 30, 2004 to Roberts, that stated Dorcely had threatened her.

In response, Defendant proffers evidence that with respect to Dorcely's assertions regarding his office and supplies, the prior school psychologists had used the same "decontamination room" as an office, and that White herself had requested and Plaintiff had received a computer and other resource materials. With regard to his assignment at the Elementary School, there is record evidence that when Plaintiff was transferred he was told that he would report directly to White, that Plaintiff was assigned to the Elementary School to assist Dr. Ifalase with his caseload, and that the other teachers also had lunch duty and at times would substitute for classes when needed. While Plaintiff states that Dr. Ifalase, Dr. Atien and one

other psychologist[7] did not have to submit their schedule to White on a regular basis, Defendant

gives evidence that Dr. Ifalase (and the prior school psychologists) were required to document

their time to the school principal. Moreover, White gave testimony that while the sample form

White had given Plaintiff to guide him in preparing his schedule was broken into fifteen minute

intervals, she did not require him to track his time every fifteen minutes.

While Plaintiff identifies Dr. Ifalase, "Dr. Atien and one other psychologist" as

similarly situated employees and appears to assert that the other classroom teachers were

similarly situated, Plaintiff has nevertheless failed to offer competent evidence from which a

reasonable trier of fact could infer that the individuals had substantially similar job

responsibilities and credentials. With respect to Dr. Ifalase, Plaintiff was assigned to the

Elementary School to assist with Dr. Ifalase's caseload, and therefore Dorcely would not

necessarily have had a separate caseload or assignment. With respect to the other psychologists,

Plaintiff fails to give any information about them except with respect to the office each occupied.

Notably, Dr. Ifalase, Dr. Atien, and Dr. Daisy have doctorate degrees, whereas Plaintiff holds

Master's Degrees in education and school psychology. To the extent he compares himself to the

other teachers, Plaintiff has not set forth evidence that those employees' responsibilities and

seniority were similar and has put forth no evidence to counter Defendant's evidence that the

other teachers had lunch duty and covered classes for absent teachers when needed.

As to Plaintiff's claims of excess scrutiny of his work performance and the

unwarranted discipline documents placed in his personnel folder, Plaintiff has failed to identify

any similarly situated employee at the Elementary School who engaged in comparable conduct

---

[7]There is a reference in the record to Dr. Daisy, who had worked for a period of time at
the Elementary School with Dr. Ifalase. (*Gilliam Aff.*, dated Oct. 3, 2008, Ex. BBB, at 55.)

who was not subject to a written disciplinary report.  While there are issues of fact surrounding the negative evaluations and disciplinary reports, even if a reasonable juror were to credit Plaintiff's account of the events underlying these events, Plaintiff has not shown sufficient evidence that the real motive for the evaluations and reports, at least in part, was discriminatory animus toward Plaintiff because of his Haitian ethnicity (or his gender). Arguably White's actions may be unfair and harsh; however Dorcely has failed to link White's disciplinary actions to his ethnicity or gender.  *Cf. Idrees*, 2009 WL 142107, at *10 ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important . . . to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals.") (internal quotation marks and citation omitted).

Further, Plaintiff's assertion that discrimination can be inferred because he was the only Haitian school psychologist in the school is insufficient, without more, to overcome his burden; "the mere fact that [he] may have been the only member of [his] protected class in [the Elementary School] does not give rise to an issue of fact."  *Watson v. Arts & Entm't Television Network*, No. 04 Civ. 1932 (HBP), 2008 WL 793596, at *17 n.5 (S.D.N.Y. Mar. 26, 2008); *Davis v. Oyster Bay-East*, No. 03-CV-1372 (SJF) (J0), 2006 WL 657038, at *10 (E.D.N.Y. Mar. 9, 2006) ("[T]he mere fact that Plaintiff was the only African American stenographer, without more, is insufficient to establish pretext."), *aff'd* 220 Fed. Appx. 59 (2d Cir. 2007).

Finally, there is no external indicia of discrimination in the record to support an inference of pretext.

In summary, Plaintiff has not introduced sufficient evidence that White treated him differently because of his ethnicity or gender to create a question of material fact for the jury. Accordingly, the summary judgment motion as to Plaintiff's equal protection claim against Defendant White is granted.

### 3. *Equal Protection Claim Against Defendant Frank Satchel*

Plaintiff alleges that Defendant Satchel recommended his termination to the Board of Education in retaliation for Plaintiff's complaints about the educational and social conditions in the Elementary School in violation of his equal protection rights. As discussed *supra*, there is no recognized claim for retaliation under the Equal Protection Clause. *See Bernheim*, 79 F.3d at 323; *see also Parker*, 2009 WL 2317840, at *3. Accordingly, Defendant Satchel's motion for summary judgment as to Plaintiff's equal protection claim is granted.

### 4. *Equal Protection Claim Against Defendant Board of Education*

Plaintiff alleges that the Defendant Board of Education engaged in a pattern of discrimination against him on account of his national origin, by treating him differently from others similarly situated in terms and conditions of employment with respect to his assignments and access to necessary resources and supplies, in violation of his equal protection rights pursuant to Section 1983.

Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), liability against a municipal entity, including a school district, arises only where the entity itself committed a wrong; "a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* It is well-settled that "[a] plaintiff stating a . . . claim via § 1983 for violation of the Equal Protection Clause by a school district or other municipal entity must show that the [violation]

-37-

was the result of municipal custom, policy, or practice." *Fitzgerald v. Barnstable Sch. Comm.*, 129 S. Ct. 788, 797 (2009) (citation omitted); *see also Monell*, 436 U.S. at 692-96 (holding the same as to a school board); *Beattie v. Madison County Sch. Dist.*, 254 F.3d 595, 600 n.2 (5th Cir. 2001) ("Under § 1983, [Plaintiff] may sue a local governing body, such as the school district, or the school board as policymaker for the district, for monetary, declaratory, or injunctive relief if the challenged action implements or executes a policy officially adopted by the body's officers. Neither the school board nor the school district can be liable for the actions . . . under a respondeat superior theory.").

In the case at hand, Plaintiff does not allege nor has he put forth any evidence of a custom or policy of the Board of Education responsible for the alleged discriminatory violations of Dorcely's rights. In fact, Plaintiff offers no argument in opposition to Defendant's motion on this claim. Accordingly, Defendant Board of Education's summary judgment motion on Plaintiff's equal protection claim is granted.

### 5. *Equal Protection Claim Against Defendants Burnett, Crawford, Bacon, Baines, Baker, Kareem and Barry White*

Plaintiff alleges that Defendants Burnett, Crawford, Bacon, Baines, Baker, Kareem and Barry White, trustees on the Board of Education, voted at the Board meeting on August 18, 2004 in favor of terminating Plaintiff's employment with the District in violation of Dorcely's constitutional right of equal protection.

As an initial matter, there is no allegation in the Complaint that any member of the Board of Education evinced a discriminatory animus toward Dorcely. Moreover, as stated above, Plaintiff has not set forth any argument that the Board of Education or that the individual board members engaged in a policy or custom of national origin (and/or gender) discrimination.

-38-

As the Supreme Court has explained, "in an official-capacity suit . . . the real party in interest is not the named official but rather the government entity itself." *Monell*, 436 U.S. at 691; *see Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding that in an official-capacity action, we require "the entity's policy or custom [to have] played a part in the violation of federal law") (internal quotation marks and citation omitted); *see also Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 122 (W.D.N.Y. 2002), *aff'd* 99 Fed. Appx. 350 (2d Cir. 2004) ("[T]here is no cause of action under 42 U.S.C. § 1983 for damages against a school board or its members in their official capacities."). Thus, as no policy or custom has been alleged, Plaintiff's claims against the individual board members in their official capacities for voting for his termination cannot stand.

Finally, to the extent that Plaintiff asserts claims against the individual board members in their individual capacities, Dorcely has not alleged nor has he set forth any evidence of a violation of a federally-protected right that could form the basis for a Section 1983 violation or of any personal involvement by any of the trustees in the relevant events underlying the Board of Education's decision. *Cf. Loret v. Selsky*, No. 07-CV-6392L, 2009 WL 204814, at *4 (W.D.N.Y. Jan. 27, 2009) (granting a motion for summary judgment on a § 1983 claim based on the lack of any personal involvement in the underlying events by a superintendent of a correctional facility who was sued in his individual capacity). Additionally, Dorcely's unsupported belief that his termination was discriminatory is further undermined by the fact that the same five members of the Board of Education who hired Dorcely at a Board meeting on September 2, 2003 were the same five members[8] who voted to terminate him at a Board meeting

---

[8]By August 2004, there were two additional Board members, Defendants Denise Baines and Shirley Baker.

on August 18, 2004.  As the governing body of the District with the power to hire and fire

District employees, the same actor inference as applied to the trustees "strongly suggests that

invidious discrimination was unlikely."  *Grady*, 130 F.3d at 560; *see Jetter v. Knothe Corp.,* 324

F.3d 73, 76 (2d Cir. 2003) ("when the person who made the decision to fire was the same person

who made the decision to hire, especially when the firing occurred only a short time after the

hiring, it is difficult to impute [to the decision maker] an invidious firing motivation that would

be inconsistent with [the] decision to hire"); *Figueroa v. New York City Health and Hosps.

Corp.*, 500 F. Supp. 2d 224 (S.D.N.Y. 2007) (applying same actor inference in context of

national origin discrimination).

   Accordingly, the summary judgment motion as to Plaintiff's equal protection

claim against Defendants Burnett, Crawford, Bacon, Baines, Baker, Kareem and White is

granted.

### B.      *First Amendment Prior Restraint/Free Association Claims*

   Plaintiff claims that his First Amendment rights of speech and association were

violated by Defendant Roberts when he, acting under color of State law, prohibited Dorcely (i)

from speaking to anyone or contacting anyone in the District, or (ii) from setting foot on District

property once he was placed on administrative leave.   According to Plaintiff, these prohibitions

constitute prior restraint that had a chilling effect on his First Amendment right to free speech

and freedom of association.

   Dorcely's claim of a prior restraint on his right to free speech is unavailing.  In his

opposition papers, the only support he proffers are his statements that "he was denied the

opportunity to speak to any of his accusers, was denied the opportunity to meet with counsel or

[a] union representative with Dr. Roberts and formally state his position, before he was

recommended for termination." (Pl.'s Mem. in Opp., at 21.) As the Supreme Court reiterated in

*Garcetti*, "[g]overnment employers, like private employers, need a significant degree of control

over their employees' words and actions; without it, there would be little chance for the efficient

provision of public services." 126 S. Ct. at 1958; *see Grennan v. Nassau County*, No. 04-2158

(DRH) (WDW), 2007 WL 952067, at *12 (E.D.N.Y. Mar. 29, 2007) (same). It is only when

employees are "speaking as citizens about matters of public concern" that public employers are

limited under First Amendment jurisprudence to those speech restrictions that are necessary for

the employer to operate efficiently and effectively. *See id.*

        Here, there is no evidence that Dorcely wished to speak to his colleagues, his

counsel or a union representative on a matter of public concern. Rather, the record indicates that

the subject matter he sought to pursue with these individuals pertained to his position with

respect to the underlying events that had occurred at the Middle School and to his status in

continuing his employment with the District. This speech neither qualifies as a "matter of public

concern" or as a form of "expressive association" protected by First Amendment speech. *See*

*Wetzel v. Town of Orangetown,* No. 07-5114-cv, 2009 WL 159268, at *2 (2d Cir. Jan. 23, 2009)

(concluding that "the allegation that Plaintiff is prevented from speaking to Town officials on the

subject of the disciplinary proceedings against her does not state a claim under the First

Amendment"); *cf. Sousa v. Roque,* No. 07-1892-CV, 2009 WL 2568949, at *8 (2d Cir. Aug. 21,

2009) (acknowledging that "speech on a purely private matter, such as an employee's

dissatisfaction with the conditions of his employment, does not pertain to a matter of public

concern. An employee who complains solely about his own dissatisfaction with the conditions

of his own employment is speaking upon matters only of personal interest") (internal quotation marks and citations omitted);

Likewise, to the extent that Plaintiff is claiming a violation of his right to freedom of association, his claim is barred as there is no generalized right of "social association." *See City of Dallas v. Stanglin,* 490 U.S. 19, 23 (1989). In *Stranglin*, a dance hall owner challenged a city's age restriction ordinance that limited admission of patrons to certain dance halls to persons between the ages of 14 and 18, arguing the ordinance violated the First Amendment and the Equal Protection Clause. *Id.* The state appellate court struck the ordinance down holding it "violated the First Amendment associational rights of minors," *id.,* because the "patrons were engaged in a form of expressive activity that was protected by the First Amendment." *Id.* at 24. The Supreme Court disagreed, holding the Constitution does not recognize a generalized right of "social association." *Id.* at 25. Noting that while "[i]t is possible to find some kernel of expression in almost every activity a person undertakes, . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *Id.* As the *Stranglin* Court put it, recreational dancing "qualifies neither as a form of 'intimate association' nor as a form of 'expressive association'" protected by the First Amendment. *Id.*

In the case at hand, there is no information before the Court that Dorcely wished to engage in anything other than personal or social association with his colleagues, counsel or a union representative. Without any evidence linking his desire to socialize to a form of intimate association or to a form of expressive association protected, as the Supreme Court has defined those terms,[9] there is no First Amendment right to be protected.

_____

[9] *See Roberts v. United States Jaycees,* 468 U.S. 609, 617-19 (1984) (quoted with approval in *Stanglin*, 490 U.S. at 23-25).

Accordingly, Defendant Roberts is entitled to summary judgment on Plaintiff's First Amendment prior restraint and free association claims.

**C.      *First Amendment Retaliation Claims***

To establish a First Amendment retaliation, a plaintiff must show that: (1) his speech addressed a matter of public concern; (2) he suffered an adverse employment action; and (3) a causal connection existed between the speech and the adverse employment action, "so that it can be said that [his] speech was a motivating factor in [the determination]." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)); *see also Mandell v. County of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003); *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001) (describing elements of a First Amendment retaliation claim).

In determining whether a public employee engaged in constitutionally protected speech, a court must determine "whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* If the answer is yes, a court must then determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.*

The courts have recognized that while the First Amendment protects employees' speech in certain circumstances, it does not permit employees to "constitutionalize the employee grievance." *Garcetti*, 547 U.S. at 420. "Although a public employee 'does not relinquish First Amendment rights to comment on matters of public interest by virtue of government

employment,' these rights are not absolute, because the [public employer] . . . has a legitimate interest in regulating the speech of its employees to promote the efficiency of its public services." *Mandell*, 316 F.3d at 382 (citing *Connick v. Myers*, 461 U.S. 138, 140 (1983)); *see also Garcetti,* 547 U.S. at 418 ("A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).          In *Garcetti*, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." 547 U.S. at 421; *see Reuland v. Hynes*, 460 F.3d 409, 415 n.5 (2d Cir. 2006); *see also Williams v. Dallas Ind. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007) ("Even if the speech is of great social importance, it is not protected by the First Amendment so long as it was made pursuant to the [public] worker's official duties."). The Court reiterated a basic premise it set forth in *Connick,* namely that "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance'." *Garcetti,* 547 U.S. at 420 (quoting *Connick,* 461 U.S. at 154).

Thus, "in *Garcetti*, the Supreme Court clarified that the threshold question in First Amendment public speech cases is two-fold. First, in determining whether the speech in question is protected, the district court must decide whether the plaintiff was speaking 'as a citizen'. . . . Second, if the court determines that the plaintiff was speaking as a citizen, it must then conduct the analysis set forth in *Connick* [*v. Meyers*, 461 U.S. 138, 154 (1983)] and establish whether, 'viewing the record as a whole and based on the content, context, and form of

a given statement, the plaintiff's speech was made as a citizen upon matters of public concern.'" *Mulcahey v. Mulrenan*, 2008 WL 110949, at *4 (S.D.N.Y. 2008) (citations omitted), *aff'd* 328 Fed. Appx. 8 (2d Cir. 2009); *accord Skehan*, 460 F.3d at 105-06 (if a public employee is not speaking pursuant to his official duties, the court must determine whether the speech relates to a matter of public concern, whether the employee suffers adverse employment action and whether the speech was a motivating factor in the employment action taken). Whether speech is protected is a question of law for the court, not a question of fact. *Connick*, 461 U.S. at 148 n.7; *see Morris*, 196 F.3d at 110; *Cozzi v. Great Neck Union Free Sch. Dist.*, No. 05-CV-1389-ENV-WDW, 2009 WL 2602462, at *11 (E.D.N.Y. Aug. 21, 2009).

The *Garcetti* Court did not "articulate a comprehensive framework" for determining whether an employee's speech is pursuant to his official duties, as opposed to as a citizen. The Court did note, however, that the test is a "practical one" and public employers "cannot restrict employees' rights by creating excessively broad job descriptions." *Garcetti*, 547 U.S. at 424. "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Id.* at 424-25.

"Speech by a public employee is on a matter of public concern if it relates 'to any matter of political, social, or other concern to the community.'" *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (quoting *Connick*, 461 U.S. at 146). "If the speech, however, is focused on matters personal to the employee, it cannot be classified as being on a matter of public concern and the government, acting as an employer, 'has greater latitude to discipline' the

employee." *Id.* (quoting *Connick*, 461 U.S. at 146). The requirement is not that the plaintiff have absolutely no personal interest; rather, that personal interest may not be the overriding one. *See Johnson,* 342 F.3d at 114. Recently, the Second Circuit clarified that for purposes of *Garcetti,* "a speaker's motive is not dispositive." *Sousa*, 2009 WL 2568949, at *8 (reaffirming the holding of *Reuland*, and holding that "the speaker's motive, while one factor that may be considered, is not dispositive as to whether his speech addressed a matter of public concern").

With these principles in mind, the Court shall proceed to examine Plaintiff's First Amendment claims against Defendants Gina Talbert, Roberts, Darlene White and the Board of Education. According to Defendants, as to each of the respective claims against them, they argue that they are entitled to judgment because (1) Plaintiff was not speaking as a citizen; (2) the speech was not on matters of public concern; and (3) there is no causal connection between the speech and the adverse employment action.

Plaintiff points to the following examples of protected speech to support his First Amendment retaliation claims against Defendants: (1) his successful challenge to Defendant Robert's recommendation that he be terminated; (2) his complaints about the lack of sufficient educational resources and instructional materials; (3) his complaints about the lack of sufficient counseling services; (4) his complaints about the inappropriate intervention measures for students; (5) his complaints about inappropriate disciplinary measures used by teachers; and (6) his complaints regarding the unjust and unequal treatment of Haitian students.

The threshold question here is whether Dorcely adequately pled that in each of these communications, he spoke as a citizen rather than pursuant to his official duties. The Court concludes that he did not.

### *(i)* *Successful Challenge to Recommendation of Termination*

With respect to Plaintiff's successful challenge to Robert's recommendation that he be terminated, Dorcely was not speaking as a citizen on matters of public concern but rather was speaking about matters of personal interest. In his letter to Dr. Roberts and the Board of Education dated November 3, 2003, Plaintiff set forth his response to Robert's recommendation of termination, (i) challenging the subjective nature of the accusations that were leveled against him, (ii) stating his professional credentials, (iii) asserting his ability to effectively interact with students and staff, (iv) addressing the September 18, 2003 and September 19, 2003 incident reports and recounting his version of the underlying events, and (v) disputing Gina Talbert's evaluations and work performance reports. (*Gilliam Decl.*, dated Oct. 3, 2008, Ex. N.)

His successful challenge at the December 9, 2003 hearing before the Board of Education related primarily to personal matters concerning his own employment at the Middle School. Thus, it is abundantly clear that because Plaintiff's speech in this regard focused entirely on his individual situation at the Middle School, his speech in connection with his successful challenge was not of a public concern and is not protected for purposes of his First Amendment retaliation claim. *See Grillo*, 291 F.3d at 235-36 (dismissing plaintiff's First Amendment retaliation cause of action where there was "no evidence that the[se] statements were uttered for any other reason than to protect [his] own rights or to air his personal grievances"); *Kelly v. City of Mount Vernon,* 344 F. Supp. 2d 395, 402 (S.D.N.Y. 2004) (holding that when employee expression "relates primarily to matters of personal interest or internal office affairs," such speech is not a matter of public concern).

### (ii) Speech Relating to Lack of Sufficient Educational Resources, Instructional Materials, Counseling Services and Relating to Inappropriate Intervention Measures and Disciplinary Measures

The substance of Plaintiff's complaints concerning the lack of sufficient educational and instructional resources and the appropriateness of the counseling curriculum are matters relating to Dorcely's own job responsibilities as an educator and school psychologist, and therefore is unprotected speech. *See, e.g., Felton v. Katonah Lewisboro Sch. Dist.*, No. 08 Civ. 9340 (SCR), 2009 WL 2223853, at * 5 (S.D.N.Y. July 27, 2009) (holding plaintiffs spoke pursuant to their official duties as educators where the substance of their complaints to their supervisors concerned "the physical state of the classroom in which they taught, the appropriateness of the curriculum, the inadequacy of their student profiles, and the safety implications [both as to them and as to their students] of those inadequate student profiles" and recognizing that these responsibilities – "ensuring that a classroom is well supplied, safe, and conducive to learning and that the curriculum is substantively appropriate – are quintessentially those of a teacher").

With respect to Plaintiff's complaints concerning inappropriate disciplinary measures and academic intervention, he proffers his May 3, 2004 memorandum to Roberts as evidence of protected speech for which he was retaliated against. A review of the memorandum and the content therein reveals that these statements were made pursuant of his official duties and not as a citizen for First Amendment purposes. In pertinent part, Plaintiff states:

> I believe that Ms. White has been motivated by her disapproval of my bringing some serious situations to her attention; namely that students are unable to read and are not being provided appropriate instruction[;] students are being disciplined by placing them in classroom bathrooms for the entire day[;] and students are being physically abused by teachers[.] Shortly after I brought these very

serious situations to Ms. White's attention, her issuance of
unwarranted written reprimands intensified and escalated.

Because I have been unable to resolve these issues with Ms. White,
I am seeking your assistance. I request the opportunity for me and
my representative to meet with you to more fully discuss the issues
which have been outlined in this memorandum, not only for my
sake, but for the educational and social well-being of the children
in our building.

(*Curry Aff.*, dated Aug. 22, 2008, Ex. Z.)

Significantly, Plaintiff made these complaints and concerns internally first to his

supervisor, Darlene White, principal of the Elementary School, and then when unable to resolve

the issues with White, to Roberts, superintendent of the District. *See Caraccilo v. Vill. of Seneca

Falls,* 582 F. Supp. 2d 390, 410 (W.D.N.Y. 2008) (internal quotation marks and citation omitted)

("[T]he reported cases are consistent in holding that when a public employee raises complaints

or concerns up the chain of command at his workplace about his job duties, that speech is

undertaken in the course of performing his job."); *see, e.g., Eugenio v. Walder*, No. 06-CV-4928

(CS)(GAY), 2009 WL 1904526, at *9 (S.D.N.Y. July 2, 2009) (holding "[w]hile the proper

reporting of child abuse is as a general proposition a matter of public safety and concern, in the

context of this case, the internal complaints related to an allegedly abusive supervisor. Thus,

Plaintiffs' complaints to supervisors concerning matters affecting . . . [their] job duties . . . were

made as . . . public employee[s], not . . . private citizen[s]") (internal quotation marks and

citation omitted).

Moreover, Plaintiff acknowledges that his statements relate to his own

responsibilities as a school psychologist and educator. In a letter to Defendant Darlene White

dated May 14, 2004, Plaintiff, in response to White's April 29, 2004 letter of reprimand, states

that his job duties include reporting mistreatment of students and academic deficiencies:

> . . . [A]s a concerned educator and a professional trained to
> address the psychological well-being of children, I was compelled
> to address issues which had been brought to my attention by
> teachers themselves or by the students. . . .  I maintain that I have
> not only the right, but an obligation to the children and their
> parents, to bring to your attention mistreatment of students by staff
> as well as deficiencies in their performance.  I should not be
> penalized for bringing these matters which are of a public and
> general concern to your attention.

(Curry Aff., dated Aug. 22, 2008, Ex. BB.)

"[P]ublic employees who convey complaints or grievances about a matter

pertaining to their official duties to their supervisors do so in their capacities as employees rather

than citizens, even when the subject matter of their speech touches upon a matter of public

concern," and therefore, such speech is not protected by the First Amendment. *Weintraub v.

Board of Educ. of the City of New York*, 489 F. Supp. 2d 209, 221 (E.D..N.Y. 2007); *see

Garcetti*, 547 U.S. at 421; *see, e.g., Eugenio*, 2009 WL 1904526, at *7 ("Plaintiffs, in making

reports of suspected child abuse, were not speaking as [] private citizens, but rather as public

employees pursuant to their official duties, and thus, their speech is not constitutionally

protected.").

Inasmuch as Plaintiff's speech was necessarily required by his job responsibilities

and was undertaken pursuant to his official duties, it cannot be said that Dorcely was speaking as

a citizen for First Amendment purposes.

### (iii)    *Speech Regarding Discriminatory Treatment of Haitian Students*

Plaintiff contends that the recommendation for his termination and eventual termination were the result of complaints he made to Defendants about the poor conditions for Haitian students and their treatment in the District as well as his identification as a Haitian national who extended himself to assist Haitian students and families adjust to the District and community.  Although Plaintiff proffers as support for his protected expression a letter dated June 24, 2004, written to Ms. White as a rebuttal to her June 2004 performance evaluation, the category of speech contained therein does not constitute speech regarding discrimination based on national origin in a government workplace, which has been held to be a matter of public concern.  *See Cotarelo v. Village of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006).  Rather the gravamen of his complaints was not to report that Darlene White (or District employees) discriminated against Haitian children, but to address the validity of White's assessment of his work performance.

In the letter, the only reference Dorcely makes concerning students of Haitian national origin is in the context of a response to White's rating of Plaintiff's performance in certain categories of evaluative criteria.  Specifically he states:

> I question how you can make any valid assessment of my performance . . . .
>
> I will now address the ratings which were given to me under specific evaluative criteria.
>
> 1. D.    Demonstrates sensitivity in relating to students.  I was rated as needing improvement in demonstrating sensitivity in relating to students.  There is no basis for this rating when it is documented and I have interceded . . . in particular with respect to the needs of Haitian students who have had difficulty assimilating into the school community because of cultural and language differences.

-51-

6. C.   Assumes responsibilities outside the classroom as they
relate to school.  I vehemently disagree with the rating of
"Needs Improvement" under this criteria.  As a member of
the Haitian community, I have extended myself to the
Haitian population to assist students and families adjust to
the Wyandanch school and community environment.  You
are aware of some of my efforts with respect to certain
students.  I have also assisted other teachers with situations
arising as to their students and there are a number of
teachers who can attest to that.

I request that this rebuttal be placed in my personnel file as my
rebuttal to the June 2004 evaluation.

(*Gilliam Aff.*, dated Oct. 3, 2008, Ex. HH.)

The "content, form and context," *Connick*, 461 U.S. at 147, of Dorcely's

expression of concern for Haitian students in the District, lead to the conclusion that these

instances of speech are not protected by the First Amendment.  There is no evidence, aside from

Plaintiff's conclusory statements in his opposition papers and Complaint, that this speech was

designed to reveal District-wide discrimination or to address the impact of discrimination on the

school environment.  *See, e.g., Woods v. Enlarged City Sch. Dist. of Newburgh*, 473 F. Supp. 2d

498, 531 (S.D.N.Y. 2007) (holding plaintiff's speech was not protected for purposes of a First

Amendment retaliation claim where plaintiff complained to her supervisor in private regarding

her performance evaluation and the racism she was subjected to and where it was not made to

implicate system-wide racism but "focused entirely on her personal situation"), *aff'd* 288 Fed.

Appx. 757 (2d Cir. 2008).  Although an employee's motivation for making the statements at

issue is not dispositive, *see Reuland*, 460 F.3d at 418, the Court notes that there is no evidence

that Dorcely's speech was voiced to the public at large or had a broader public purpose.  *See*

*Burns v. Cook*, 458 F. Supp. 2d 29, 40 (N.D.N.Y. 2006) (concluding speech was not protected

where "[p]laintiff communicated this speech in a private and direct matter with no apparent intention of voicing her discontent to the public at large").  Thus, looking at the complaints contained in the letter as a whole in addition to the content and context of the entire record, it is clear that Dorcely's speech was not on matters of public concern.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's First Amendment retaliation claims against them.

### D. Due Process Claims

Plaintiff asserts due process claims against (i) Defendant Geter, assistant superintendent of human resources, (ii) Defendants Burnett, Crawford, Bacon, Baines, Baker, Kareem, and Barry White, the trustees on the Board of Education, and (iii) Defendant McCord, attorney for the District.

"The Due Process Clause provides that certain substantive rights – life, liberty, and property – cannot be deprived except pursuant to constitutionally adequate procedures." *Desir v. Board of Coop. Educ. Servs.*, No. 07-CV-1994 (RRM)(MJO), 2008 WL 4508735, at *2 (E.D.N.Y. Sept. 30, 2008) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)).  Thus, at the outset, Dorcely must show that he possesses a property interest that is protected by the Constitution.  *See Strong v. Board of Educ.*, 902 F.2d 208, 211 (2d Cir. 1990); *see also Ezekwo v. New York City Health & Hosp. Corp.*, 940 F.2d 775, 782 (2d Cir. 1991) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it . . . [h]e must, instead, have a legitimate claim of entitlement to it."); *see also Webb v. Kenney*, 234 F. Supp.2d 197, 201 (E.D.N.Y. 2002) ("In order to determine whether there is a due process claim there must first be a property interest that rises to a level characterized as an

entitlement.") (internal quotation marks and citation omitted). If a protectable property interest is found, the Court will then determine whether Plaintiff was deprived of that property interest without due process of law. *See id.; see also Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (holding the Due Process Clause imposes procedural safeguards on governmental decisions that deprive individuals of liberty or property interests, within the meaning of the Fifth or Fourteenth Amendments).

### *(1)      Due Process Claims Against Defendants Geter, Burnett, Crawford, Bacon, Baines, Baker, Kareem, and Barry White*

#### *(a)      Substantive Due Process Violations*

Although not expressly stated in his opposition papers, Plaintiff appears to claim that his allegedly unlawful termination deprived him of substantive property rights associated with being a school psychologist for the District. Because Dorcely's employment with the District was as a probationary employee, Defendants move for summary judgment asserting that the loss of his probationary employment does not constitute deprivation of a substantive property interest to sustain a due process claim. Defendants are correct.

"Property interests in employment positions are not created by the Constitution but are defined by state law." *Castro v. New York City Bd. of Educ.*, 777 F. Supp. 1113, 1117 (S.D.N.Y.) (citing *Bishop v. Wood*, 426 U.S. 341, 344 (1976) and *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)), *aff'd* 923 F.2d 844 (2d Cir. 1990). Under New York state law, it is well-established "that service as a probationary teacher does not confer a property right sufficient to establish a § 1983 substantive due process claim." *Desir*, 2008 WL 4508735, at *2 (finding a probationary teacher had no protectable property right that might entitle him to the substantive protections of the Fourteenth Amendment and therefore dismissed his § 1983 due process claim);

*see* N.Y. Educ. Law § 2590-j 7(a); *Venes v. Community Sch. Bd.*, 43 N.Y.2d 520, 525 (1978) (holding under New York law a probationary employee has no property interests in his employment and may be discharged for "almost any reason or no reason at all").

Because Dorcely was a probationary school psychologist for the District, he has no protectable property interest in his employment at stake that might entitle him to the substantive protections of the Fourteenth Amendment. Accordingly, Defendants' summary judgment motion on Plaintiff's substantive due process claims is granted.

### (b) *Procedural Due Process Violations*

Plaintiff argues in his opposition papers that Defendants denied him due process when (i) he was not apprised of documentation that had been placed in his personnel file and was denied access to his personnel file until the day before his termination hearing, (ii) he was placed on administrative leave without being afforded an opportunity to be heard, and (iii) his personal belongings were removed from his office at the Middle School and delivered to his garage prior to any action to terminate him. Plaintiff's procedural due process claims are without merit.

To prevail on a procedural due process claim under the Fifth and Fourteenth Amendments, a plaintiff must demonstrate that he "has a property interest, created by state law, in the employment or the benefit that was removed." *Bernheim v. Litt*, 79 F.3d 318, 322 (2d Cir. 1996); *see Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995). Procedural due process then requires that "a deprivation of life, liberty, or property be preceded by notice and opportunity for a hearing appropriate to the nature of the case." *Loudermill*, 470 U.S. at 541 (internal quotation marks and citation omitted). "The implication is that procedural protections depend entirely upon the existence of substantive rights." *Desir*, 2008 WL 4508735, at *3.

As stated above, because Dorcely's status as a probationary employee does not confer a protected property right in his probationary employment sufficient to require procedural protections, termination of his probationary position as a school psychologist likewise does not trigger a procedural due process cause of action. *See, e.g., Castro*, 777 F. Supp. at 1117 ("It is well settled under New York law that a probationary employee has no property rights in his employment . . . . A probationary employee who has been dismissed is therefore not entitled to a hearing."). In turn, Plaintiff does not have a legitimate claim of entitlement with respect to any lesser, attendant aspects of his job, and he has not established the deprivation of some other property or liberty right, such as the contents of his personnel file. *See Shub v. Hankin*, 869 F. Supp. 213, 216 (S.D.N.Y. 1994), *aff'd* 66 F.3d 308 (2d Cir. 1995) (questioning whether even a *tenured* public employee has a protectable property interest in personnel actions short of termination) (emphasis supplied); *cf. Marino v. Shoreham-Wading River Cent. Sch. Dist.*, No. CV-08-0825 (SJF) (WDW), 2008 WL 5068639, at *5 (E.D.N.Y. Nov. 20, 2008) (noting that the procedural requirements of New York Education Law § 3020 with respect to letters placed in personnel files apply to *tenured* teachers) (emphasis supplied); *Holt v. Board of Educ. of Webutuck Cent. Sch. Dist.*, 52 N.Y.2d 625, 631 (1981) (same).

Moreover, while Dorcely's alleges that his reassignment to administrative leave at home violated his due process rights, he has failed to establish the deprivation of a protected property or liberty interest or an erroneous deprivation of such interest through the procedures used. Here, Plaintiff was reassigned to paid, administrative leave at home pending the outcome of Robert's investigation into Talbert's charges; was given a statement of reasons for the recommendation of termination; responded to the statement of reasons; and was afforded a

hearing before the Board of Education at which he testified. *See Ramberran v. Dellacona*, No. 07-CV-304 (CBA), 2008 WL 905217, at *4 (E.D.N.Y. Mar. 31, 2008) ("An employee who continues to be paid by his employer cannot sustain a claim for deprivation of property without due process."); *see also O'Connor v. Pierson*, 426 F.3d 187, 199 (2d Cir. 2005) (noting that "no court has held that an employee on fully paid leave has been deprived of a property right merely by virtue of being relieved of his job duties"); *cf. Seils v. Rochester City Sch. Dist.*, 192 F. Supp. 2d 100, 121 (W.D.N.Y. 2002) (concluding plaintiff's two-day suspension without pay "[did] not implicate a property interest of constitutional dimension"), *aff'd* 99 Fed. Appx. 350 (2d Cir. 2004).

Finally, Plaintiff has failed to establish the requisite property interest in having his personal items remain in the Middle School or to demonstrate the deprivation of a due process right by having his personal items removed from the school and delivered to his home.

Accordingly, Defendants' summary judgment motion on Plaintiff's procedural due process claims is granted.

### *(2)* *Due Process Claim Against Defendant McCord*

Plaintiff alleges that Defendant McCord denied Plaintiff his due process rights in violation of 42 U.S.C. § 1983 by: (1) failing to respond to Plaintiff's numerous requests for a "statement of reasons" regarding the recommendation that Plaintiff be terminated from his position and for access to his personnel file; (2) predetermining that Plaintiff was going to be terminated because of his belief that Plaintiff did not get along well with defendant Darlene White; and (3) denying Plaintiff procedural safeguards during a hearing before the Board of Education. (Compl. ¶ 138.) In this regard, Plaintiff premised his claims against McCord based

on his belief that McCord was a District employee,[10] and therefore a state actor.  Defendant

McCord now moves for summary judgment on this claim contending principally that as private,

outside legal counsel to the District, he was not an employee or state or governmental actor and

therefore is not subject to liability under § 1983.  Defendant is correct.

As set forth above, under Section 1983 a claim for relief must allege "the

deprivation of a right secured by the Constitution or laws of the United States . . . which has

taken place under color of state law."  *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997).

Thus, it is well-settled that in order for a plaintiff to succeed on a claim under Section 1983, he

must demonstrate "that the challenged conduct was attributable at least in part to a person acting

under color of state law." *Whitely v. Comsat Corp.*, No. 00 CIV. 9401 (WHP), 2001 WL

1135946, at *6 (S.D.N.Y. Sept. 25, 2001).  "Private conduct, no matter how discriminatory or

wrongful, is generally beyond the reach of Section 1983."  *Grant v. Hubert*, No. 09-CV-1051

(JBW), 2009 WL 764559, at *1 (E.D.N.Y. Mar. 20, 2009) (citing cases).

---

[10]Although Plaintiff (and even McCord) initially believed that McCord was an employee of the District, the evidence before the Court indicates that during the relevant time period, McCord was not an employee of the District.  Notably, on June 19, 2006, the District filed an Answer on behalf of all Defendants except McCord, and counsel for the District advised McCord by letter dated August 4, 2006 that he was not authorized to represent McCord in this action based on the insurance carrier's determination that McCord was not an employee of the District as of the date of Plaintiff's claims.  *See Memorandum and Order,* dated February 7, 2007 (DRH), at 2.  Plaintiff asserts that based on McCord's past representations as an employee and the nature of his involvement in this action by the Board of Education, McCord should be deemed a state actor.  Because the record shows, as discussed *infra,* that McCord was not an employee of the District at the relevant time and there was no evidence presented that McCord conspired with the District to deprive Dorcely of his constitutional rights, Plaintiff's assertions, without more, are insufficient to establish that Defendant was a state actor. *See, e.g., Gottlieb*, 84 F.3d at 518.

Here, the injury Plaintiff claims to have suffered is a deprivation of his procedural due process rights caused by McCord's actions, or lack thereof.  However, the evidence fails to show that McCord is a state actor.

It is uncontroverted in this case that McCord was on leave[11] from his employee status with the District from July 1, 2004 through June 30, 2005.  (Def. McCord 56.1 Stmt., ¶¶ 1-2, Ex.A.)  Beginning in July 2004, the District retained McCord to act as outside private counsel to the District.  (*Id.*)  Plaintiff indicates that the relevant timeline of events during which Dorcely, through his attorney, communicated and corresponded with McCord was from July 23, 2004 to August 11, 2004.  (Pl.'s 56.1 Stmt. Response, ¶ 7.)  Thus, from July 23, 1004 to August 11, 2004, McCord was not an employee of the District, and cannot be considered a state actor on this basis.

Moreover, there is no allegation made or evidence proffered that McCord was acting in concert with a state actor, such as the District, in order to inflict unconstitutional injury upon Plaintiff.  *See Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (listing elements to sustain a Section 1983 conspiracy claim); *Gillard v. Gaffney,* No. 00-cv-5945 (DLI)(MLO), 2009 WL 2045151, at *4 (E.D.N.Y. July 9, 2009) (same).  Nor can an inference be made that in his capacity as a privately retained attorney to the District, McCord acted in concert with the District to deprive Plaintiff of constitutional rights.  *Cf. Brooks v. The New York State Supreme Court, Appellate Div. First Dep't*, No. 02-CV-4183 (RR), 2002 WL 31528632, at *3 (E.D.N.Y. Aug. 16, 2002), *aff'd* 76 Fed. Appx. 356 (2d Cir. 2003).

_____

[11]McCord was on sabbatical beginning June 30, 2004 so he could serve as outside counsel to the District.  (Def. McCord 56.1 Stmt., ¶¶ 1-2, Ex.A.)

Finally, even assuming McCord was a state actor, the acts alleged by Plaintiff, in his capacity as a probationary employee, do not rise to the level of a constitutional deprivation of a protectable liberty or property right. *See supra; Castro*, 777 F. Supp. at 1117; *see also Shub v. Hankin*, 869 F. Supp. 213, 216 (S.D.N.Y. 1994), *aff'd* 66 F.3d 308 (2d Cir. 1995).

Accordingly, Defendant McCord's summary judgment motion is granted.

### III.    *Title VII Claims*

Title VII prohibits an employer from discriminating against any individual "with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S. § 2000e-2(a)(1). Plaintiff asserts that the Defendant Board of Education violated his rights when it terminated his employment with the District on account of his national origin and in retaliation for his (i) complaints concerning the educational and cultural problems at the Elementary School and the inappropriate discipline by certain teachers in the District in violation of Title VI, (Compl. ¶¶ 146-48), and (ii) repeated opposition to discriminatory treatment in the District, (Pl.'s Mem. in Opp., at 7).

#### A.    *Discrimination Based on National Origin*

To establish a prima facie case of discrimination, a plaintiff must show that: (1) he belonged to a protected class, (2) was qualified for the position he held or sought, and (3) suffered an adverse employment action (4) under circumstances giving rise to an inference of discriminatory intent. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).

Because the Court has already dismissed Plaintiff's Section 1983 claims to the extent that they are based on national origin discrimination, his claims under Title VII which are

based on this theory of recovery must fail as well. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506 n. 1 (1993) ("*McDonnell-Douglas* framework is fully applicable to racial-discrimination-in-employment claims under 42 U.S.C. § 1983"); *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 . . . and the factors justifying summary judgment dismissing Patterson's Title VII claim against the municipal defendants for termination of his employment equally support the summary dismissal of his claims for termination brought under 42 U.S.C. §§ 1981 and 1983.") (citations omitted); *see also Flynn v. New York State Div. of Parole*, 620 F. Supp. 2d 463, 488 (S.D.N.Y. Mar. 6, 2009) (same).

### B.    *Retaliation*

Title VII "forbids an employer to retaliate against an employee for, *inter alia*, complaining of employment discrimination prohibited by Title VII." *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-3(a)). Claims of retaliation pursuant to Title VII are analyzed according to the burden-shifting framework set forth in *McDonnell-Douglas*. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003)

"In order to present a prima facie case of retaliation under Title VII . . . , a plaintiff must adduce 'evidence sufficient to permit a rational trier of fact to find [1] that []he engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a

retaliatory motive played a part in the adverse employment action.'"  *Kessler*, 461 F.3d at 205-06

(quoting *Cifra v. General Elec.  Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (brackets in original)).

        The first element of the prima facie standard requires that Plaintiff have taken

"action . . . to protest or oppose statutorily prohibited discrimination."  *Cruz v. Coach Stores,*

*Inc.*, 202 F.3d 560, 566 (2d Cir. 2000); *see Taylor v. Family Residences & Enter.*, No. 03-6122

(DRH), 2008 WL 268801, at *13 (E.D.N.Y. Jan. 30, 2008).  This includes, for example

"informal protests of discriminatory employment practices, including making complaints to

management, writing critical letters to customers, protesting against discrimination by industry

or society in general, and expressing support of co-workers who have filed formal charges."

*Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *see Cruz,* 202 F.3d at

566.  In order to satisfy this prong of a retaliation claim, the plaintiff need only have a good faith

reasonable belief that he was opposing an employment practice made unlawful by Title VII."

*Kessler,* 461 F.3d at 210; *see Everson v. New York City Transit Auth.*, No. 1:02-CV-1121-ENV-

JMA, 2007 WL 539159, at *27  (E.D.N.Y. Feb. 16, 2007) ("protected activity . . . refers to any

action taken to oppose statutorily prohibited discrimination").  Additionally, "in satisfying the

knowledge requirement, only general corporate knowledge that the plaintiff engaged in a

protected activity is necessary."  *Id.*

        As an initial matter, Plaintiff must establish that he engaged in protected activity

and that Defendants knew about that participation.  In support of his claim, Dorcely alleges that

he complained about

> the inability of children at the Dr. Martin Luther King, Jr.
> Elementary School to read and complained about a lack of
> sensitivity to the particular cultural and language challenges that
> Haitian children in the district were experiencing and that there

> were inappropriate disciplinary measures taken against children at
> said elementary school.

(Compl., ¶ 146.)   Dorcely asserts that he repeatedly voiced his opposition to the cultural

insensitivity toward and discriminatory treatment of Haitians throughout his employment in the

District.

Although Dorcely fails to set forth any of the particulars of such complaints, the

Court will assume for purposes of determining whether he has met the prima facie threshold that

he can (1) establish that he engaged in protected speech to the extent that he voiced complaints

to Defendants concerning discriminatory treatment of and cultural insensitivity toward Haitian

nationals in the District, *see Amin v. Akzo Nobel Chems., Inc.,* 282 Fed. Appx. 958, 961 (2d Cir.

2008) ("Informal complaints to management as to discrimination on a basis prohibited by Title

VII are prohibited activity."); *see also Lamberson v. Six West Retail Acquisition Inc.,* 122 F.

Supp. 2d 502, 511 (S.D.N.Y. 2000) ("Protected oppositional activities include informal as well

as formal complaints and complaints to management"); *cf. Crawford v. Metropolitan Gov't of*

*Nashville & Davidson County,* 129 S. Ct. 846, 851 (2009), and voiced concerns that he was

being retaliated against for having made such complaints, *see Martinez v. New York City Dep't*

*of Educ.,* No. 04 Civ. 2728 (LTS) (DFE), 2008 WL 2220638, at *11 (S.D.N.Y. May 27, 2008)

(acknowledging that retaliation complaints for protected activity constitutes protected activity as

well), and (2) that the Board of Education was on notice about the complaints Dorcely made to

his supervisors and the superintendent.  *See Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007)

("general corporate knowledge" is sufficient to satisfy the knowledge requirement).

With respect to the third prima facie element, Plaintiff contends that after making

his complaints about discrimination based on national origin, he sustained materially adverse

changes in employment by being placed on administrative leave, recommended for termination, transferred to a different school and ultimately discharged from the District.  A factfinder might well conclude that these actions and the alleged concomitant adverse consequences, if proven true, would dissuade a reasonable worker from voicing charges of discrimination.  *See Burlington Northern & Santa Fe Ry. v. White,* 548 U.S. 53, 62-65 (2006) (holding that "actionable retaliation" was that which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination").  While Defendants do not appear in their opposition papers to dispute that Plaintiff suffered an adverse employment action, they do dispute the final, or fourth, prong of his prima facie case of Title VII retaliation: causation.  That is to say, Defendants contend there was no causal connection between Plaintiff's complaints of discrimination based on national origin and the adverse action.

"Proof of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment . . . or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, . . . or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Med. Ctr.*, 821 F.2d 111, 115 (2d Cir. 1987) (emphasis in original) (internal quotation marks and citations omitted).  Here, as discussed above, Plaintiff has not presented evidence of disparate treatment nor has he alleged that any member of the Board of Education evinced a discriminatory animus toward him.  Nevertheless, temporal proximity alone may suffice to establish causation where proximity is very close.  *See Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001); *Kessler v. Westchester County Dept. of Soc. Servs.,* 461 F.3d

199, 210 (2d Cir. 2006). In *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306 (2d Cir. 2005), the Second Circuit acknowledged:

> [t]his Court had not established a specific delay between protected activity and adverse employment action that defeats an inference of causation. *Gorman-Bakos v. Cornell Co-op Extension,* 252 F.3d 545, 554-55 (2d Cir. 2001) (listing cases in the context of Title VII retaliation). We have in the past held that a delay of three months was fatal to a showing of causation, *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990), and that a delay of eight months supported a showing of causation, *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980).

*Id.* at 314.

In the present case, Plaintiff proffered evidence, albeit de minimis, that some time during April 2004, he had complained to White about certain teacher's treatment of students as well as educational and cultural concerns he had regarding Haitian students in the District and sent a memo to Roberts on May 3, 2004 concerning the same. (*Gilliam Decl*., dated October 3, 2008, Exs. R, X, Z, BB, EE, FF, HH, BBB.) Shortly thereafter, White sent a memo to Roberts recommending his discharge, and Plaintiff was in fact terminated three months thereafter. Thus, for purposes of this motion, the Court will assume that Plaintiff has satisfied the causal nexus requirement and has established a prima facie case of retaliation.

Next, as discussed in the previous sections, Defendants have articulated legitimate, non-retaliatory reasons for their termination: Plaintiff's poor work performance, lack of professionalism, insubordination and inappropriate workplace behavior as reflected in multiple reports and evaluations. *See, e.g.*, *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) ("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action.").

Finally, Plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that Defendants' explanation is merely a pretext for impermissible retaliation. Construing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has failed to meet this burden. Dorcely relies solely on his statements that he was discriminated against and has provided no evidence to support his allegations that he was retaliated against for engaging in protected activity.

The documents Dorcely proffers in support of his claims of discrimination fail to identify a "complaint" of discriminatory treatment of Haitian nationals for which he was retaliated against. *See supra.* As discussed previously, his reference to students of Haitian national origin in these documents relate solely to what efforts he had made with respect to meeting the needs of Haitian students who were having difficulty assimilating into the school because of cultural and language differences and his efforts to assist the Haitian students and families to adjust to the Wyandanch school and community. *Id.* There is no evidence that this speech revealed District insensitivity to the culture of Haitian nationals or addressed the impact of discriminatory treatment in the school environment. His conclusory statement in his opposition papers that he voiced repeated complaints of discrimination and cultural insensitivity to Defendants throughout his employment for which he was retaliated against, without more, is insufficient to create an issue of fact for trial. *See Hayes v. New York City Dep't of Corrections,* 85 F.3d 614, 619 (2d Cir. 1996) ("factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not genuine issues for trial") (internal quotation marks and citation omitted); *Brummell v. Webster Central Sch. Dist.*, No. 06-CV-06437, 2009 WL 232789, at *5 (W.D.N.Y. Jan. 29, 2009) (holding that absent a claim of unlawful discrimination, general

complaints about employment concerns do not constitute protected activity under Title VII).

"An assumption devoid of evidence to support it is conclusory," *Dowrich v. Aramark Healthcare Support Serv., Inc.,* No. 03-CV-2392 (DLI) (VVP), 2007 WL 2572122, at *9 (E.D.N.Y. Sept. 4, 2007), and "mere conclusory allegations" cannot establish a pretext to defeat a summary judgment motion, *Schapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

In short, Plaintiff has not provided any evidence from which a juror or this Court could infer that Defendants' proffered reasons for Plaintiff's termination were pretextual or that the actual reason for the adverse employment actions was discrimination based on national origin. *See Smith v. American Exp. Co.,* 853 F.2d 151, 154-55 (2d Cir. 1998); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985); *see also Harrison v. North Shore Univ. Hosp.*, No. CV 04-2033 (WDW), 2008 WL 656674, *13 (E.D.N.Y. Mar. 6, 2008). Accordingly, the motion for summary judgment on Plaintiff's Title VII retaliation claim is granted.

## IV.    *Title VI Claims*

Title VI of the Civil Rights Act of 1964 provides as follows:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000(d).

"In order to establish a claim based on Title VI, the plaintiff must show, *inter alia*, that the defendant discriminated against [him] on the basis of race, that the discrimination was intentional, and that the discrimination was a substantial or motivating factor for the defendant's actions." *Tolbert v. Queens Coll.,* 242 F.3d 58, 69 (2d Cir. 2001) (internal quotation marks and citations omitted). Thus, in order to be cognizable under Title VI, defendants'

discriminatory intent must "actually play[] a role in" and have a "determinative influence" on the adverse employment action. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). "Allegations of employment discrimination under Title VI . . . are analyzed under the same three-part burden shifting framework of *McDonnell-Douglas* as Title VII claims." *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 629 (S.D.N.Y. 2009); *Solomon v. Uniondale Union Free Sch. Dist.*, No. 03-CV-2415, 2007 WL 608137, at *3 (E.D.N.Y. Feb. 17, 2007) (observing that the Title VII burden-shifting framework applies to Title VI cases).

For reasons set forth above, Dorcely's inability to establish a triable case of discrimination based on national origin under Title VII or Section 1983 is equally fatal to his claims under Title VI. Accordingly, the motion for summary judgment on Plaintiff's Title VI claim is granted.

## V.      State Law Claims

Plaintiff's Complaint does not set forth a specific cause of action under the New York State Human Rights Law, but states in connection with his jurisdiction statement that he "asserts a violation of his equal protection rights under the New York State Executive Law, based on race,[12] national origin and in retaliation for engaging in protected activity." (Compl. ¶ 1.) To the extent that Plaintiff raises claims under New York state law based on the causes of action set forth above, his claims likewise fail.

Employment discrimination claims brought under the New York State Executive Law are analytically identical to discrimination claims brought under Title VII. *See Van Zant v.*

---

[12] Even though Plaintiff refers  to race discrimination in his Complaint, he does not pursue any racial discrimination claims in his opposition papers. (Pl.'s Mem. in Opp., dated Oct. 3, 2008; *Curry Aff.* , dated Aug. 22, 2008, Ex. QQ.)

*KLM Royal Dutch Airlines,* 80 F.3d 708 (2d Cir. 1996); *see Potenza v. West Irondequoit Central Sch. Dist.*, No. 06-CV-6407, 2009 WL 2876204, at * 11 (W.D.N.Y. Sept. 2, 2009) (same); *Brennan v. City of White Plains*, 67 F. Supp. 2d 362, 371-72 (S.D.N.Y. 1999) (noting the legal standards governing claims under Section 1983 and Title VII are the same as the New York Human Rights Law).

For the reasons stated above, because the Court applies the same standard and analysis to Plaintiff's state law claims as it applies to his discrimination claims under Title VII and Section 1983, the Court grants summary judgment in favor of Defendants on the state law claims.

## VI.     *Qualified Immunity Defense*

Defendants argue that the individual defendants are all protected by the qualified immunity defense.

"The qualified immunity doctrine shields governmental officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Poe v. Leonard*, 282 F.3d 123, 131 (2d Cir. 2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Loria v. Gorman*, 306 F.3d 1271, 1281 (2d Cir. 2002).

Inasmuch as the Court finds that Plaintiff has failed to prove a constitutional violation or that he suffered any unlawful discrimination, the issue of the individual defendants' qualified immunity defense is moot.  "Without an underlying constitutional violation, qualified immunity cannot attach."  *The Cathedral Church of the Intercessor v. The Incorporated Village of Malverne,* 353 F. Supp. 2d 375, 391 (E.D.N.Y. 2005); *see Saucier v. Katz*, 533 U.S. 194, 201

(2001) ("[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity"); *Rivera v. Goord*, 253 F. Supp. 2d 735, 757 (S.D.N.Y. 2003) (following the grant of summary judgment, the court does "not address the issue of defendants' qualified immunity as the issue is moot").

## CONCLUSION

For all of the above reasons, Defendants' motions for summary judgment is **GRANTED.** Upon entry of judgment, the Clerk shall close this case.

**SO ORDERED.**

Dated: Central Islip, New York
       September 30, 2009

                                         _____/s/_____
                                         Denis R. Hurley
                                         United States District Judge